UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

CHERYL FOTI, DENNIS MCCULLOUGH, and
CYNTHIA LOFTUS,

                        Plaintiffs,

                                                            **Hon. Hugh B. Scott**

        -vs-                                                10-CV-575-RJA-HBS

                                                            **Report
                                                            &
CITY OF JAMESTOWN BOARD OF                                  Recommendation**
PUBLIC UTILITIES and CITY OF JAMESTOWN,

                        Defendants.

———————————————————————


        This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1) for all

pretrial matters, and to hear and report on dispositive motions (Docket No. 13).  Plaintiffs Cheryl

Foti, Cynthia Loftus, and Dennis McCullough, residents of the City of Jamestown, New York,

commenced this action against the City and its Board of Public Utilities ("BPU") (collectively,

"defendants") on July 13, 2010, alleging that sewage overflows from defendants' sewage

treatment system on June 20, 2009 and August 9, 2009 violated the federal Clean Water Act

("CWA") and the New York State Environmental Conservation Law ("ECL") (Docket No. 1).

Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b) to dismiss the

complaint for lack of subject matter jurisdiction and failure to state a claim, or, alternatively, for

summary judgment pursuant to Rule 56 (Docket No. 12).

        For the following reasons, it is recommended that defendants' motions to dismiss the

complaint be **denied** in their entirety.

**BACKGROUND**

I.  **Regulatory Framework**

Plaintiffs allege violations of the CWA, which is implemented by regulations promulgated by the Environmental Protection Agency ("EPA"), and is enforced in conjunction with state standards for permitting discharges into navigable waters–here, the State Pollution Discharge Elimination System ("SPDES") established by the New York State Department of Environmental Conservation ("DEC") pursuant to ECL.  Because the claims are based on the interaction of these statutes and other federal regulations, an introduction to their relevant structures is helpful.

The central provision of the CWA generally prohibits the "discharge of any pollutant by any person."  33 U.S.C. § 1311.  The primary exception to this prohibition is 33 U.S.C. § 1342(a)(1), which authorizes federal and state agencies to issue permits for the discharge of pollutants, provided the discharge complies with the conditions of the CWA.  In New York, the DEC is responsible for issuing these permits under its SPDES permit program.  Essentially, the permit exception was created to transform the generally applicable provisions of the CWA into specific obligations of individual entities that discharge pollutants.  E.P.A. v. Cal. State Water Res. Control Bd., 426 U.S. 200, 205 (1976).

Both the DEC and the EPA are charged with enforcing compliance with SPDES permits.  See 33 U.S.C. § 1319(a)(1).  In addition, private citizens may bring suit in federal court against a CWA violator, including for SPDES permit violations.  33 U.S.C. § 1365(a).  However, citizen-plaintiffs must provide the violator with notice of their intent to sue sixty days prior to filing suit.  33 U.S.C. § 1365(b)(1).

In this case, plaintiffs are asserting their CWA claims as private citizen-plaintiffs pursuant to 33 U.S.C. § 1365(a).

## II.    Factual Background

Plaintiffs Cheryl Foti, Cynthia Loftus, and Dennis McCullough reside on Widrig Avenue in Jamestown (Docket No. 16-4, ¶ 2; Docket No. 16-5, ¶ 2; Docket No. 16-2, ¶ 2).  Plaintiffs allege that the Widrig Avenue sewer line has frequently overflowed after heavy rainfall over the years, which subsequently results in the discharge of raw sewage through a manhole in the center of the street and onto the adjacent properties (Docket No. 16-5, ¶¶ 6, 7).  When the sewer overflows, plaintiffs allege that raw sewage backs up through the sewer line and discharges into the basements of their homes (id.).  Plaintiffs allege that they have often complained to the City and the BPU about the raw sewage discharges onto their properties and into their basements, which have forced plaintiffs to spend considerable time and money to repair damage to their properties (Docket No. 1, ¶ 25).

Ms. Foti has resided on Widrig Avenue since 1998, and recalls raw sewage discharging into her basement in 1998, May 2004, November 2006, June 20, 2009, and August 9, 2009 (Docket No. 16-4, ¶ 5).  During the May 2004 sewer overflow, Ms. Foti recalls that fecal material discharged into her basement (id., ¶ 9).  Ms. Loftus recalls raw sewage discharges "repeatedly occurring" since she moved into her Widrig Avenue home in 1985, and has "witnessed the streets being flooded with sewage, and experienced numerous substantial floods of raw sewage in [her] own basement."  Docket No. 16-5, ¶ 6.  In particular, Ms. Loftus recalls a substantial discharge of raw sewage into her basement and flooding on Widrig Avenue on June 20, 2009,

-3-

and upon returning home after the August 9, 2009 sewer overflow, observed "toilet tissue residue in and around Widrig Avenue …." Id., ¶¶ 9, 10.

Mr. McCullough has lived on Widrig Avenue since 1990, and "for the entire time h[as] observed and experienced sanitary sewer discharges from the manhole in the center of the street and into [his] basement and the basements of [his] neighbors." Docket No. 16-2, ¶ 18. Mr. McCullough recalls raw sewage discharges occurring in April 1994, January 1996, June 1998, May 2004, November 2006, June 20, 2009, and August 9, 2009 (id., ¶¶ 20-22).[1]

Mr. McCullough alleges that, in addition to poor maintenance, the sewer system suffers from design defects which create a bottleneck effect on Widrig Avenue (id., ¶ 12). As shown below in the court's rendition of the BPU's Sewer Line Map, Widrig Avenue runs east and west (Docket No. 16-3 at 11). Ellis Avenue runs in the same direction, and meets Widrig Avenue to the east (id.). Hallock Avenue meets Widrig Avenue perpendicularly to the east, and Kenmore Avenue and Front Street run parallel to Widrig Avenue to the north and south, respectively (id.). A fifteen-inch collection sewer line flows north on Hallock Avenue, and intersects with Front Street; here, the Hallock Avenue fifteen-inch collection sewer line accepts both eastward and westward flowing eight-inch sewer lines from Front Street (id.). The Hallock Avenue fifteen-inch collection sewer line continues to flow north, before intersecting with Ellis Avenue and Widrig Avenue; however, at this intersection, the Hallock Avenue fifteen-inch collection sewer line becomes an eight-inch collection sewer line, which continues to flow north (id.). At the intersection of Hallock Avenue, Ellis Avenue, and Widrig Avenue, an eight-inch sewer line

---

[1]In addition to plaintiffs' sewer overflow recollections, BPU records show that between 1989 and 1996, at least seventeen other instances of sewage overflow on Widrig Avenue were reported by the street's residents to the BPU (Docket No. 16-3 at 19-52).

flows westward from Ellis Avenue before emptying into a fifteen-inch sewer line on Widrig

Avenue (id.).  The Widrig Avenue fifteen-inch sewer line – after accepting the westward flow

from the Ellis Avenue eight-inch sewer line and the northward flow from the Hallock Avenue

fifteen-inch collection sewer line – flows west until it reaches the center of Widrig Avenue (id.).

Here, the westward flowing Widrig Avenue fifteen-inch sewer line meets with an eastward

flowing eight-inch sewer line on Widrig Avenue, and then empties into an eight-inch collection

sewer line which flows north toward Kenmore Avenue (id.).



Plaintiffs allege that, after heavy rainfall, the sewer line bottleneck effect creates pressure

under the manhole cover in the center of Widrig Avenue, and, thus, creates a geyser-like flow of

sewage onto the street and into the storm water collection system. (Docket No. 16-2, ¶¶ 14-16).

Contemporaneously, plaintiffs – who all reside on Widrig Avenue in the area where the fifteen-

inch sewer line creates pressure on the sewer system – experience sewage backups into their basements (id., ¶ 16).  Defendants, on the other hand, contend that the sewage outflows occur as a result of "an overwhelming amount of rain in a short period of time."  Docket No. 12-15 at 21.

On April 21, 2005, fourteen concerned Widrig Avenue residents signed a letter to the BPU "seek[ing] to have the longstanding sewer and water problem on [their] street addressed and corrected."  Docket No. 16-3 at 57.  At that time, the Widrig Avenue residents reported that they "experienced severe sewer backup problems that … created extensive damage" to their homes "[s]ince at least 1990 and as recently as May, 2004 …."  Id.  The residents complained that each rainfall creates the potential for sewage overflows into basements on Widrig Avenue, thereby damaging properties and creating a public health risk (id.).

The DEC wrote a letter to the city of Jamestown on February 1, 2006 which stated:

> The [Sanitary Sewer Overflow] matter has been referred to the Division of Legal Affairs for enforcement purposes.  This referral is the result of prohibited bypasses from the City of Jamestown's ("City") sanitary sewer collection system at certain overflow points.  Also, there have been sewage backups into certain homes in the City, creating a public health nuisance.
>
> The [DEC] is cognizant of the prior actions undertaken by the City to reduce its sanitary sewer overflows ("SSOs") through the plugging of a majority of the City's sanitary to storm sewer bypasses.  As you are aware, however, the plugging was only a temporary solution to the need for an overall sanitary sewer overflow abatement plan.
>
> Enclosed is an Order on Consent ("Order") that addresses the overall abatement of SSOs in the City.  It also imposes a civil penalty in the amount of $51,000, of which only $1,000 is payable at the present time.  The remaining balance is suspended provided the City fully complies with the obligations under the Order, particularly the requirements under Schedule A. …

Docket No. 12-2 at 2.

The Order on Consent was executed by the BPU and DEC on August 17, 2006, setting

forth a "Schedule of Compliance" for addressing the reported SSOs[2] (id. at 18-20), and stating

that: "Upon completion of all obligations created in this Order, this Order settles all claims for

civil and administrative penalties concerning the violations described in this Order against [the

City of Jamestown]." Id. at 13. The Order on Consent stipulated, however, that the City's

> … failure to comply fully and in a timely fashion with any provision, term or
> condition of this Order shall constitute a default and failure to perform an
> obligation under this Order and under the ECL and shall constitute sufficient
> grounds for revocation of any permit, license, certification or approval issued to
> [the City of Jamestown] by the DEC.

Id. at 14.

Under the Schedule of Compliance, the BPU was required to provide a verbal report to

the DEC of any SSOs within twenty-four hours of the event, and a written report within five days

of the event (id. at 18). In addition, the BPU was required to submit to the DEC "an Engineering

Report for the elimination of all [SSOs] and basement backups[, including a] schedule for

implementing the elimination of these items," and a separate "plan for continuous system

assessment, flow monitoring, correction and maintenance." Id. at 18-19. As characterized by the

BPU, the 2006 Order on Consent recognized "that Jamestown's effort to eliminate SSOs and

sewage backups involved a long-term process of study, planning, reporting and implementation."

Docket No. 12-15 at 8.

The DEC issued the BPU a SPDES permit on June 1, 2007 (Docket No. 12-2 at 22). The

SPDES permit was "issued in compliance with the Environmental Conservation Law of New

---

[2]The Order on Consent set forth nineteen reported SSOs between August 2003 and November 2005, none
of which involved Widrig Avenue (see Docket No. 12-2 at 11).

York State and in compliance with the Clean Water Act," and prescribed wastewater pollutant

parameters and effluent limits (id. at 22-28).  In addition, the SPDES permit prohibited SSOs,

stating that

> bypass, of the collection and treatment system without treatment are prohibited
> except when (1) the bypass is necessary to prevent loss of life, personal injury,
> public health hazard or severe property damage and (2) there is no feasible
> alternative to the bypass and (3) the permittee complies with the notice
> requirements of 6 NYCRR Part 750-2.7.

Id. at 27.

Pursuant to the terms of the Order on Consent, the BPU submitted a "Sanitary Sewer

Collection System Evaluation Study" to the DEC on August 13, 2007 (Docket No. 12-3 at 3).

The BPU stated that "[t]he main thrust of the study is to identify sources of [sewer system]

inflow," so the BPU can "reduc[e] the amount of inflow into the collection system … [and] avoid

the far more costly alternative of sewer replacement/enlargement."  Id. at 5.  The study outlined

three main "task priorities" for the BPU: (1) monitor sewer collection lines, (2) survey and

rehabilitate sewer collection line manholes, and (3) purchase generators to keep the collection

system from overflowing during a power outage (id. at 12).  The BPU allocated $200,000

annually for identifying and eliminating sources of infiltration and inflows into the sanitary sewer

system (id. at 13).

After reviewing the BPU's "Sanitary Sewer Collection System Evaluation Study," the

DEC submitted its comments and further required actions to the BPU on April 29, 2008  (Docket

No. 12-9 at 2).  The DEC ordered the BPU to prepare two separate documents: (1) an

Engineering Report for the elimination of all SSOs and basement backups, and (2) a plan for

Collection System Monitoring and Maintenance (id.).

The DEC required the BPU's Engineering Report to be more specific and comprehensive than the Sanitary System Study the BPU submitted August 13, 2007.  For example, the DEC stipulated that the Engineering Report "must include an identification of the problems, recommended solutions to those problems, and when these corrections will be implemented and the problems eliminated …," and "must present specific actions that will be undertaken to eliminate overflows and basement backups."  Docket No. 12-9 at 6-7 (emphasis in original).  The Engineering Report was to be a comprehensive plan of implementation, not merely a study of Jamestown's sewer problems with proposed temporary solutions.  The DEC stated that "[t]hese are challenging problems to overcome, and correction may require significant expenditures of time and money."  Id. at 8.

To satisfy the Collection System Monitoring and Maintenance plan, the DEC required the BPU to "[d]evelop, maintain and implement a Capacity, Management, Operation and Management (CMOM) program."  Id. at 2.  The DEC advised the BPU that the CMOM "is essentially developing and implementing a program (not just a report) …."  Id..  The DEC outlined the general standards for the CMOM as follows:

> The program should be effective at reducing wet weather flows and eliminating … SSOs or bypasses that receive less than secondary treatment as required by the Clean Water Act to ensure the protection of public health, receiving water(s) and the environment during wet weather period[s] from a separate sanitary sewer system serving public owned treatment works (POTW).  The primary performance measures for the CMOM program are:
>
> - Reductions in the number of backups and SSOs
> - Reduction in peak wet weather flows in the system
> - Minimization of pump station failures and overflows due to equipment malfunction

Id. at 2-3.  The DEC also provided minimum components for the CMOM program, including, for example, identifying major program goals, establishing system design and inspection standards, developing an overflow emergency response plan, developing a system evaluation and capacity assurance plan, and monitoring the effectiveness of the CMOM program (id. at 3-6).  In addition, the BPU must "review, update and modify the CMOM plan annually and submit to DEC an annual report describing all actions taken in the preceding year no later than February 28th of each year."  Id. at 6.

In its Engineering Report submitted to the DEC on July 30, 2008, the BPU identified problem areas and proposed repair solutions, detailed completed repairs and projects, and outlined the additional studies needed to address the DEC's concerns (id. at 18-29).  The BPU submitted its initial CMOM Report to the DEC on November 26, 2008 (Docket No. 12-10 at 2).

On June 20, 2009, Jamestown experienced heavy rainfall (Docket No. 12-15 at 11). Plaintiffs allege that, at approximately 9:15 a.m. on that date, "sewage from a sewer line overflowed onto Widrig Avenue, onto the surrounding property, and into the storm water drains that lead to navigable waters."  Docket No. 16 at 3.  Plaintiffs have submitted photographs that appear to show sewage flowing from manhole covers on Widrig Avenue into the storm drains (Docket No. 16-3 at 13-14).  Plaintiffs also allege that this incident resulted in sewage backups into their basements (Docket No. 16 at 3).  Plaintiffs further allege that the BPU did not notify the DEC of the SSOs either verbally within twenty-four hours, or in writing within five days, and thereby violated the 2006 Order on Consent (Docket No. 16-2 at 11).

Two days later, on June 22, 2009, the DEC wrote a letter to the BPU commenting on the July 30, 2008 Engineering Report, the November 26, 2008 CMOM Report, and the SSOs that

-10-

occurred on June 20, 2009 (Docket No. 12-9 at 12-15).  The DEC found both submissions

deficient, and required the BPU to submit revised reports with specific changes (id.).

Commenting on the Engineering Report, the DEC wrote:

> Serious problems remain which require correction.  We received calls
> from citizens asserting that basement backups of sewage occurred on Widrig
> Avenue on June 20, 2009. …
>
> The [Engineering Report] outlines one specific action; the sealing of
> Manhole T27, and outlines other areas of further study to identify what actions are
> necessary to eliminate overflows and basement backups.
>
> We can accept this approach, but we will need additional annual reporting
> to document the results of the studies, the recommendations for rehabilitation, the
> schedules for rehabilitation, and post rehabilitation evaluations to document the
> degree of effectiveness of implemented rehabilitations.  Please modify your report
> to incorporate specific dates into a timeline of actions you will implement.  Please
> use specific dates instead of general dates such as "Spring," or "Late 2009".  The
> timeline must include date, action (e.g. "Drainage area 3B Study"), and post
> rehabilitation report date.

Id. at 12-13.  The DEC also commented that the BPU's November 26, 2008 CMOM Report fell

short of its expectations, and similarly ordered the BPU to submit a revised CMOM Report (id. at

14-15).

On August 9, 2009, Jamestown experienced another heavy rainfall (Docket No. 12-15 at

11).  Plaintiffs allege that "in the early afternoon, sewage from a sewer line overflowed onto

Widrig Avenue, onto the surrounding property, and into the storm water drains that lead to

navigable water."  Docket No. 16 at 3.  Plaintiffs also allege that this incident resulted in sewage

backups into their basements (Docket No. 16 at 4).  Plaintiffs further allege that the BPU did not

notify the DEC of the SSOs either verbally within twenty-four hours, or in writing within five

days, and thereby violated the 2006 Order on Consent (Docket No. 16-2 at 11).

On August 29, 2009, in response to the DEC's June 22, 2009 deficiency letter, the BPU

submitted its revised Engineering Report (Docket No. 12-16 at 4).  The revised report

"provide[d] a detailed proposed plan for DEC approval to address [inflow and infiltration]

issues," and "provide[d] specific schedules for implementing and evaluating rehabilitations."  Id.[3]

In October 2009, the BPU capped or plugged dozens of "pick and pry" holes on manhole

covers near Widrig Avenue (Docket No. 12-1, ¶ 6).  The BPU stated that "[t]hese actions are

components of our ongoing efforts to eliminate SSO issues in Jamestown and reduce the

likelihood of any outflows from the sanitary sewer system on to Widrig Avenue in the future."

Id.  The BPU contends that since October 2009, they have not received any reports of sewage

outflows from the Widrig Avenue manholes (id.).

Plaintiffs provided the BPU with notice of their intent to sue for violations of the Clean

Water Act ("CWA") on January 15, 2010 (Docket No. 16-3 at 78).  Plaintiffs alleged that the

BPU committed the following violations:

> [T]he unlawful discharge of sanitary sewer onto the streets referenced herein
> without secondary treatment of such sanitary sewer and into the complainant's
> basements thereby violating 33 U.S.C.A. §§ 1311(a) and 1311(b)(1)(B) of the
> [CWA] and further by violating a certain order on consent entered into with the
> [DEC] dated August 17, 2006 ….  Such violations occurred at and around real
> property located on Widrig Avenue, Kenmore Street and Front Street in the City
> of Jamestown, New York … on or about Saturday, June 20, 2009 and Sunday,
> August 9, 2009, and complainants are informed and believe that such violations
> have continued or will continue to occur.

Id.

---

[3]On August 27, 2010, the DEC approved BPU's revised Engineering Report for the elimination of sanitary
sewer overflows and basement backups (Docket No. 12-14 at 2).

In response to the DEC's June 22, 2009 deficiency letter, the BPU submitted its revised CMOM Report to the DEC on February 26, 2010 (Docket No. 12-10).  The BPU contends that the revised CMOM Report was "a comprehensive plan for DEC approval entailing methods and procedures designed to meet all aspects of an approved SPDES operator including, among other things, taking 'all feasible steps to stop, and mitigate the impact of, sanitary sewer overflows.' " Docket No. 12-16, ¶ 14.

The BPU also submitted its 2009 Annual Report for the "Elimination of Sanitary Sewer Overflows" to the DEC on February 26, 2010 (Docket No. 12-12).  According to the BPU, the 2009 Annual Report "shows concrete actions taken in 2009 to address SSO issues …," and "that Jamestown was pro-active in spending large sums of money to improve its sanitary sewer system by implementing various elements of its Engineering Report and CMOM Report while awaiting approval and/or further comments from the DEC."  Docket No. 12-16, ¶ 15.  In this February 26, 2010 submission to the DEC, the BPU reported that the storms of June 20, 2009 and August 9, 2009 caused basement backups and SSOs (see Docket No. 12-12 at 5).

On July 13, 2010, plaintiffs filed this action alleging that the SSOs and basement backups that occurred on June 20, 2009 and August 9, 2009 constituted violations of the CWA and state laws (Docket No. 1, ¶¶ 1-4, 28, 29).  Specifically, plaintiffs allege that: (1) defendants' failure to comply with the 2006 Order on Consent and the 2007 SPDES permit constitutes a violation of the CWA, 33 U.S.C. §§ 1311(a), 1365(a)(1); (2) defendants' continuous discharge of raw sewage presents an "imminent and substantial endangerment to the health of persons," a violation of the Act, 33 U.S.C. § 1364; and, (3) defendants constructed, maintained, and operated the sewer system in a negligent manner, in violation of state laws (id., ¶¶ 35-57).

In lieu of answering, defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56(b) (Docket No. 12 at 2).  Specifically, defendants contend that (1) the court lacks subject matter jurisdiction over plaintiffs' citizen suit because plaintiffs failed to adequately provide defendants with the CWA-required notice of their intent to sue; (2)  plaintiffs' suit is barred by the "permit shield" defense, because the alleged CWA violations occurred while defendants were in compliance with a valid SPDES permit; (3) plaintiffs' claims are based on "upset" events which, under federal regulations, cannot be the basis for a CWA citizen suit; (4) plaintiffs have failed to allege a continuous or intermittent violation of permit requirements because improvements to the Jamestown sewer system after the 2009 SSOs have reduced the risk of future SSOs on Widrig Avenue; and (5) the SSOs did not constitute discharges of pollutants from a point source into navigable waters of the United States (see Docket No. 12-15 at 2-3).

The court will first address defendants' argument that the complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and because "matters outside the pleadings [have been] presented to and not excluded by the court," Fed. R. Civ. P. 12(d), the court must consider defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a plausible claim upon which relief can be granted as a motion for summary judgment pursuant to Rule 56.

For the following reasons, it is recommended that defendants' motion be **denied** in its entirety.

-14-

## DISCUSSION

I.      **Subject Matter Jurisdiction**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists," and in this procedural posture, a court "may refer to evidence outside the pleadings."  Id.

Under the CWA, "no [private citizen suit] may be commenced … prior to sixty days after the plaintiff has given notice of the alleged violation … to any alleged violator of the standard, limitation, or order."  33 U.S.C. § 1365(b)(1)(A).  EPA regulations further specify the notice letter's requirements:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a).

Private citizen-plaintiffs must satisfy the CWA's "strict notice requirements in order to give government agencies a chance to take responsibility for enforcing environmental regulations and the alleged violators an opportunity to comply with the CWA."  Citizens Against Retail Sprawl (C.A.R.S.) v. U.S. Army Corps of Eng'rs, 2005 WL 3534178, at *5 (W.D.N.Y. Dec. 23, 2005) (citing Hudson Riverkeeper Fund v. Putnam Hosp. Center, Inc., 891 F. Supp. 152, 155 (S.D.N.Y. 1995)).  However, the Second Circuit has "refused to 'allow form to prevail over

substance' in considering the content required of [a notice] letter, and ha[s] looked instead to what the particular notice given may reasonably be expected to accomplish." Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 487 (2d Cir. 2001) (citing Dague v. City of Burlington, 935 F.2d 1343, 1354 (2d Cir. 1991), rev'd in part on other grounds, 505 U.S. 557 (1992)).  Ultimately, to determine if a private citizen-plaintiff's notice is adequate, a court "must consider whether the[ ] notice letter served the purpose that Congress intended: To provide the recipient with effective, as well as timely, notice." Pub. Interest Research Group of N.J. v. Hercules, Inc., 50 F.3d 1239, 1249 (3d Cir. 1995); see also Hudson Riverkeeper, 891 F. Supp. at 155.

As set forth in detail above, plaintiffs' January 15, 2010 notice letter stated that the discharge of sewage onto Widrig Avenue and surrounding streets and into their basements on June 20, 2009 and August 9, 2009 violated Sections 1311(a) and 1311(b)(1)(B)[4] of the CWA and the 2006 Order on Consent, and that plaintiffs believe the violations will continue to occur (see Docket No. 16-3 at 78).  Defendants argue that the notice letter neither identifies a specific violation of the 2006 Order on Consent or the 2007 SPDES permit, nor offers "a specific plausible explanation of how the two storm events resulted in the discharge of any sewage to a water of the United States …," and, therefore, the BPU "was without any means to address Plaintiffs' concerns in a fashion that would avoid future violations of the CWA." Docket No. 12-15 at 16.

---

[4]Section 1311(a) prohibits "the discharge of any pollutant by any person …."  33 U.S.C. § 1311(a).  Section 1311(b)(1)(B) requires that, to carry out this objective, "publicly owned treatment works" must comply with "effluent limitations based upon secondary treatment …" as defined by the EPA.  33 U.S.C. § 1311(b)(1)(B).  Defendants contend that there can be no finding of a violation of these CWA provisions because the BPU was in compliance with the 2006 Order on Consent and the 2007 SPDES permit (see Docket No. 12-15 at 15-16).  This contention is addressed by the court in the text below in its discussion of the "permit shield" defense.

To support its reading of the CWA's notice requirement, defendants rely on Klebe v. Tri Mun. Sewer Comm'n, 2008 WL 5245963 (S.D.N.Y. Dec. 17, 2008), and C.A.R.S., 2005 WL 3534178, two cases in which the court found notice of the alleged violation to be inadequate.  In Klebe, the defendant's SPDES permit set discharge limits for twelve different types of pollutants, but the plaintiff's notice letter alleged only that the defendant discharged "unpermitted waste products" into the Hudson River.  The court found this broad accusation insufficient to exercise subject matter jurisdiction over the CWA violations alleged in the complaint.  Klebe, 2008 WL 5245963, at *5-6.  In C.A.R.S., the plaintiffs' notice letter merely stated that the defendants "failed to conform" to their SPDES permit, and the court held the plaintiff's notice insufficient to alert the defendants to the alleged CWA violations.  2005 WL 3534178, at *7.

Here, however, plaintiffs' notice letter specifically states that the BPU violated the 2006 Order on Consent and the CWA by discharging untreated "sanitary sewer" onto the streets and into their basements.  Docket No. 16-3 at 78; see 33 U.S.C. § 1362(6) ("The term 'pollutant' means … sewage, garbage, sewage sludge … [and] municipal … waste discharged into water."). While it is true that plaintiffs did not specify which provision of the Order on Consent was violated, the discharges described in the notice letter are similar, if not identical, to the recurring overflows from the City's sanitary sewer system which necessitated the enforcement action addressed by the Order of Consent.  The long, recorded history of plaintiffs' complaints to the BPU about SSOs on Widrig Avenue provides adequate support for the reasonable inference that the events described in the notice letter constituted a violation of the CWA's prohibition against the discharge of pollutants, the requirements imposed on the BPU by the Schedule of Compliance attached to the Order of Consent, or the prohibition against SSOs and other effluent

-17-

limits imposed by the 2007 SPDES permit.   Against this background, the letter clearly sets forth

sufficient information to allow the BPU to identify "the specific standard, limitation, or order

alleged to have been violated, the activity alleged to constitute a violation, the person or persons

responsible for the alleged violation, the location of the alleged violation, the date or dates of

such violation," and other details necessary to provide defendants with effective and timely

notice in accordance with the requirements of 40 C.F.R. § 135.3(a).

Simply put, the policy rationale for strict interpretation of the CWA notice requirement,

found to be present in such cases as Klebe and C.A.R.S., is absent here.  The notice requirement

is designed to give the accused entity the opportunity to correct the problem, Atl. States Legal

Found., Inc. v. Stroh Die Casting Co., 116 F.3d 814, 820 (7th Cir.), cert. denied, 522 U.S. 981

(1997), and "the citizen is not required to list every specific aspect or detail of every alleged

violation." Hercules, 50 F.3d at 1248.  Here, the record established that defendants were already

long aware of the SSO problems reported by plaintiffs in the notice letter, and were in fact

already hard at work on a proposed solution.

Based on this record, the court finds that plaintiffs' January 15, 2010 letter provided

defendants with adequate notice of the alleged CWA violations sufficient to confer subject

matter jurisdiction over their citizen suit.  Accordingly, defendants' motion to dismiss the action

pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction should be **denied**.

## II.     Summary Judgment

Defendants also move to dismiss the complaint pursuant Rule 12(b)(6) for failure to state

a claim upon which relief can be granted, or, alternatively, for summary judgment pursuant to

Rule 56.  As alluded to above, Rule 12(d) requires the Court to treat a Rule 12(b)(6) as a motion

for summary judgment under Rule 56 when "matters outside the pleadings are presented to and

not excluded by the court …."  Fed. R. Civ. P. 12(d).  This Rule also requires the Court to give

all parties "a reasonable opportunity to present all the material that is pertinent to the motion."

Id.  As is evident from the discussion above, both parties in this case have submitted numerous

materials which pertain to matters not referenced in the pleadings, and which have not been

excluded by the Court in its consideration of the issues presented. Accordingly, the Court must

consider defendants' motion to dismiss the complaint under the standards for determining a

motion for summary judgment.

Rule 56 provides that '[t]he court shall grant summary judgment if the movant shows that

there is no genuine issue as to any material fact and the movant is entitled to judgment as a

matter of law." Fed R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party," and facts are "material" if they

"might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).

The movant bears the burden of showing the absence of a genuine issue of material fact,

and the proffered evidence must be viewed in the light most favorable to the nonmovant.  See

Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  If the movant meets this burden, the

burden then shifts to the nonmovant to come forward with evidence "sufficient to satisfy every

element of the claim." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).

Summary judgment is proper "only when reasonable minds could not differ as to the

import of evidence." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The court's function

is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. " <u>Anderson</u>, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996).

In this case, defendants seek dismissal of the complaint and judgment in their favor on plaintiffs' CWA claims, based on the following grounds:

A.      The "permit shield" defense;

B.      The "upset" defense;

C.      Failure to allege a reasonable likelihood of future SSOs on Widrig Avenue; and,

D.      The SSOs alleged do not constitute discharges of pollutants from a point source into navigable waters of the United States.

Each of these grounds is discussed in turn.

## A.      Permit Shield Defense

The statutory "permit shield" defense provides that "[c]ompliance with a permit issued pursuant to th[e CWA] shall be deemed compliance" with the CWA.  33 U.S.C. § 1342(k). Consequently, if a SPDES permit holder complies with the provisions of its permit, it cannot be liable in a private citizen suit for CWA violations.  <u>See Coon v. Willow Dairy, L.P.</u>, 536 F.3d 171, 173 (2d Cir. 2008).  Accordingly, to enjoy "permit shield" protections, the permit holder "must comply with all conditions of [its] permit," and "[a]ny permit noncompliance constitutes a violation of the [CWA] and is grounds for enforcement action."  40 C.F.R. § 122.41(a); <u>see also</u> <u>Atl. States Legal Found., Inc. v. Eastman Kodak Co.</u>, 12 F.3d 353, 357 (2d Cir. 1993) ("The

purpose of [Section 402(k)] seems to be ... to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict."), cert. denied, 513 U.S. 811 (1994).

Defendants contend that the permit shield applies in this case because the 2007 SPDES Permit, which was issued with the recognition of the process undertaken by the City of Jamestown to develop and implement a long-term plan to eliminate SSOs, specifically provided that, at the time the permit was issued, the City of Jamestown "was operating in full compliance with State and Federal law."  Docket No. 17 at 5.  While defendants have not identified where in the SPDES permit, or Order on Consent, this language is located, the record nonetheless indicates that defendants were indeed in substantial compliance with applicable laws and regulations when the SPDES permit was issued in 2007.  However, both the permit and the Order on Consent impose ongoing obligations.  For example, the Order on Consent expressly provides that any failure on the part of defendants to comply with the terms and requirements of the Order "shall constitute sufficient grounds for revocation of any permit" issued by the DEC.  Docket No. 12-2 at 14.  One such requirement is to provide the DEC with a verbal report of any SSOs within twenty-four hours of the event, and a written report within five days of the event (see id. at 18).  According to plaintiffs, defendants failed to report the SSOs within the required time period after the June 20, 2009 and August 9, 2009 events (Docket No. 16 at 20).

Defendants have not refuted this allegation, but instead acknowledge that they did not report these SSOs to the DEC until February 26, 2010–over seven months after the initial event, and five months after the second event (Docket 12-12 at 5).  In addition, the DEC's letter to defendants dated June 22, 2009–two days after the SSOs–stated that the DEC "received calls

from *citizens* asserting that basement backups of sewage occurred on Widrig Avenue on June 20, 2009." Docket No. 12-9 at 12 (emphasis added). The letter does not reference any verbal communication between the BPU and the DEC within the required twenty-four hour period, and defendants have not referred the court to any evidence that would indicate compliance with the Order on Consent's five-day written notice requirement (id.). In the court's view, this presents a question of fact as to whether the BPU failed to satisfy the reporting requirements, and whether such failure provided sufficient grounds for the DEC to revoke defendants' SPDES permit.

Moreover, the permit flatly prohibits SSOs in Jamestown (subject to certain exceptions), and defendants' 2009 Annual Report described the occurrence of no less than thirteen SSOs and nineteen basement backups during the reporting period (see Docket No. 12-12 at 5). Defendants maintain that four of the SSOs and eleven of the backups–including the SSOs at issue here–resulted from the weather events occurring on June 20 and August 9, 2009, thereby providing an affirmative defense to the CWA claims in this action. This "upset" argument is addressed by the court in the next section of this report and recommendation. For the purpose of determining the applicability of the permit shield, however, the evidence of thirteen SSOs and nineteen basement sewer backups during 2009, when viewed in the light most favorable to plaintiffs (and in conjunction with the evidence discussed above regarding defendants' reporting of the Widrig Avenue SSOs under the obligations imposed by the Order on Consent), presents genuine issues of fact as to whether defendants have complied with all of the requirements of the SPDES permit in a manner sufficient to entitle them to the protection of the CWA's permit shield as a matter of law.

Accordingly, defendants' motion to dismiss the complaint based on the "permit shield" defense should be **denied**.

### B.      "Upset" Defense

EPA regulations promulgated pursuant to the CWA provide that an "upset" event "constitutes an affirmative defense to an action brought for noncompliance with [a] technology based permit."  40 C.F.R. § 122.41(n)(2).  An "upset" event is defined as

> … an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee.  An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

40 C.F.R.§ 122.41(n)(1).  "In any enforcement proceeding the permittee seeking to establish the occurrence of an upset has the burden of proof."  40 C.F.R. § 122.41(n)(4).

Defendants argue that they are entitled to assert the "upset" affirmative defense to CWA liability because the June 20, 2009 and August 9, 2009 SSOs were the result of "an overwhelming amount of rain in a short period of time."  Docket No. 12-15 at 21.  According to defendants' 2009 Annual Report, the June 20, 2009 storm produced 1.89 inches of rain in under two hours; the August 9, 2009 storm produced 1.35 inches of rain in under two hours, and produced an additional 0.92 inches of rain the following morning in under one hour (see Docket No. 12-12 at 5).

Plaintiffs respond that the June 20, 2009 and August 9, 2009 SSOs were not "upset" events, but instead occurred as a result of "specific design defects in the sewer system and a lack of proper maintenance …."  Docket No. 16 at 15.  According to plaintiffs, the "bottleneck" effect

created by the meeting of westward flowing fifteen-inch sewer lines with eastward flowing eight-inch sewer lines under Widrig Avenue creates a pressure buildup under the manhole cover in the center of the street, resulting in discharges of raw sewage onto the street, into basements, and into the storm drains during heavy rainfall (see Docket No. 16 at 15).

As discussed above, the BPU stated in its August 2007 Sanitary Sewer Collection System Evaluation Study that the goal of the study was to effectively manage sewer system intake "to avoid the far more costly alternative of sewer replacement/enlargement." Docket No. 12-3 at 5. In the court's view, this acknowledgment that sewer "replacement" or "enlargement" was a potential, yet costly, solution to the SSO problem is sufficient to support the reasonable inference that the sewer system was either defectively designed or maintained. This inference is further supported by evidence in the record – including the occurrences reported in defendant's 2009 Annual Report and the declaration of plaintiff Dennis McCullough (Docket No. 16-2) – suggesting that storms and SSOs similar to the events of June and August 2009 occurred on a fairly regular basis in Jamestown over the previous twenty years.

Based on this record, when viewed in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, the court finds that questions of fact exist as to whether the June 20, 2009 and August 9, 2009 storms were "exceptional incident[s] in which there is unintentional and temporary noncompliance with technology based permit effluent limitations" precluding application of the "upset" defense to bar plaintiffs' CWA citizen suit as a matter of law. The court also finds that plaintiff should be allowed to explore these issues through discovery in order to have a reasonable opportunity to present all materials pertinent to the issues raised by defendant's motion, as required under Rule 12(d).

-24-

Accordingly, defendants' motion to dismiss the complaint based on the "upset" affirmative defense should be **denied**.

### C.      Reasonable Likelihood of Future Violations

The CWA provides that "any citizen may commence a civil action ... against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).  "The term 'to be in violation' as used in § 1365 has been interpreted to require that 'citizen-plaintiffs allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future.' "  George v. Reisdorf Bros. Inc., 696 F. Supp. 2d 333, 336 (W.D.N.Y. 2010) (quoting Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 57 (1987)), aff'd, 410 Fed. Appx. 382 (2d Cir. 2011).  Indeed, "[t]he CWA does not permit suits for 'wholly past violations.' "  Reisdorf Bros., 696 F. Supp. 2d at 336 (internal citations omitted).

Defendants contend that plaintiffs cannot allege continuous or intermittent violations of the prohibition against SSOs in the 2007 SPDES permit and 2006 Order on Consent because the BPU "capped or plugged dozens of pick and pry holes on manhole covers between Widrig to Todd, including Kenmore and West 3rd Street" in October 2009.  According to defendants, since there have not been any SSOs subsequent to this remedial action, there is no reasonable likelihood that SSOs will occur on Widrig Avenue in the future (Docket No. 12-15 at 23).

However, the record reflects that Widrig Avenue residents have experienced flooded basements and streets following heavy rainfall dating back to at least 1989 (see, e.g., Docket No.

16-3, pp. 19-52).  As suggested by statements in the sworn declarations of plaintiffs Foti and

McCullough, and exhibits attached thereto, SSOs followed heavy rainfall events in April 1994,

January 1996, June 1998, May 2004, November 2006, June 20, 2009, and August 9, 2009

(Docket No. 16-4, ¶ 5; Docket No. 16-2, ¶¶ 20-22).  This proffered evidence indicates that the

heavy rainfalls causing SSOs on Widrig Avenue are not predictable annual events, but rather

several years have often passed between these occurrences.  As pertinent to the issues in this

case, only two years have passed since the SSO-causing storms of 2009.  Based on this history,

and considering the record as a whole in the light most favorable to plaintiffs, it is not crystal

clear to the court that the absence of SSOs since October 2009 is to be credited entirely to

plugging the "pick and pry holes" on the Widrig Avenue manhole covers.  Indeed, it seems

equally plausible that no SSOs have occurred since October 2009 because there have been no

rainfall events heavy enough to cause one.

Furthermore, as mentioned above, plaintiffs allege that the SSOs on Widrig Avenue are

the result of a defectively designed sewer system that creates a bottleneck effect where a fifteen-

inch sewer line meets an eight-inch line (Docket No. 16-2, ¶¶ 12-15).  This bottleneck effect

allegedly creates a geyser-like flow of sewage onto the street and into the storm water collection

system (id., at ¶ 14).  Defendants do not deny plaintiffs' allegations about the faulty sewer

design, and instead respond by asserting that plaintiffs are not qualified to make this

determination (Docket No. 17 at 11).  However, assuming the truth of plaintiffs' allegations for

the purposes of deciding the issues raised by defendants' motion, and in the absence of any

helpful discovery in this regard, the court finds that the location of plaintiffs' homes – along the

fifteen-inch sewer line near the alleged location of the bottleneck – gives rise to a reasonable

inference that the larger sewer line could cause pressure under the manhole in the center of

Widrig Avenue, resulting in the SSOs.

Considering this record, the court finds that a question of fact exists as to whether

defendants' efforts to plug holes on manhole covers has reduced the likelihood that SSOs will

continue to occur on Widrig Avenue, precluding plaintiffs from asserting a claim under

section 1365(a)(1) of the CWA as a matter of law.  As such, defendants' motion to dismiss the

complaint based on the reduced likelihood of future permit violations should be **denied**.

## D.      Point Source to Navigable Waters

Finally, defendants contend that plaintiffs have failed to plead an essential element of

their CWA claim, namely, that the SSOs resulted in an unauthorized discharge of a pollutant into

a navigable water of the United States.  In this regard, the CWA "prohibits the discharge of a

pollutant by any person from any point source to navigable waters except when authorized by" a

valid permit, such as a SPDES permit.  <u>Waterkeeper Alliance, Inc. v. E.P.A.</u>, 399 F.3d 486, 491

(2d Cir. 2005) (internal quotation marks and citations omitted) (citing 33 U.S.C. §§ 1311(a),

1342).  At issue here is whether the storm drain that receives sewage overflow on Widrig Avenue

is a point source that leads to navigable waters.

The CWA defines "point source" as "any discernible, confined and discrete conveyance,

including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure,

container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft,

from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  The Supreme Court

has held that the CWA "makes plain that a point source need not be the original source of the

pollutant; it need only convey the pollutant to 'navigable waters.' " Rapanos v. United States, 547 U.S. 715, 743 (2006) (quoting South Fla. Water Mgmt. Dist. v. Miccosukee Tribe, 541 U.S. 95, 105 (2004)).  Rapanos recognized that "the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between."  Rapanos, 574 U.S. at 743 (citing United States v. Velsicol Chemical Corp., 438 F. Supp. 945, 946-47 (W.D. Tenn. 1976) (finding CWA violation where pollutant was discharged into municipal storm sewer system which flowed into navigable waters)); see also United States v. Ortiz, 427 F.3d 1278, 1281 (10th Cir. 2005) (considering a storm drain that flowed into a river a point source); see also United States v. Agosto-Vegau, 617 F.3d 541, 550 (1st Cir. 2010) (considering a storm sewer that flowed into a creek a point source).

Here, plaintiffs allege that after the June 20, 2009 and August 9, 2009 storms, raw sewage discharged through the manhole covers onto Widrig Avenue and flowed into the storm water collection system (Docket No. 16-2 at 5).  In addition, after plaintiffs' basements backed up, the raw sewage was "typically pumped out of the homes onto the street …," where the raw sewage "drain[ed] into the storm water catch basins …."  Id.  Then, according to plaintiff, the raw sewage travels through the storm water collection system and is discharged into the Chadakoin River and Cassadaga Creek – navigable waters of the United States (Docket No. 16 at 13).

Defendants respond that these allegations by plaintiffs, who, admittedly, are not qualified to render opinions about the "fate and transport" of pollutants into "navigable waters of the United States," fail to state a plausible claim for relief under the CWA.  However, the court's reading of the pertinent cases indicates that, to effectuate the  CWA's stated goal of "restor[ing]

and maintain[ing] the chemical, physical and biological integrity of the Nation's waters …," 33 U.S.C. § 1251(a), the terms "point source" and "navigable waters" are to be construed expansively, and courts have found these standards met in instances where storm drains empty into creeks.  See, e.g., Velsicol, 438 F. Supp. at 946-47; see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc., 2005 WL 2001037, at *1 (E.D.Cal. Aug. 19, 2005) ("The term 'navigable waters' is interpreted broadly to include any canal, ditch or storm sewer system which ultimately, either directly or indirectly, flows (even if only periodically) into a waterway of the United States.") (citing cases from the 9th and 11th Circuits).  Accepting as it must the truth of plaintiffs' allegations, and drawing all reasonable inferences in their favor, the court finds that plaintiffs have stated a plausible claim that the overflow of raw sewage from the City's sanitary sewers through manholes and into the storm drains on Widrig Avenue is a discharge from a point source that empties into navigable waters, in violation of the CWA.

Based on this analysis, defendants' motion to dismiss plaintiffs' complaint for failure to allege these essential elements of their CWA claim should be **denied**.

## CONCLUSION

For the foregoing reasons, the court finds that plaintiffs have satisfied the CWA's notice requirement in a manner sufficient for this court to assume subject matter jurisdiction over the claims in this citizen suit.  The court also finds that, viewing the proffered evidence in the light most favorable to plaintiffs, defendants have failed to meet their burden of showing the absence of genuine issues of material fact to warrant summary judgment in their favor on those claims as a matter of law.  Accordingly, it is respectfully recommended that defendants' motion (Docket

No. 12) be **denied** in its entirety, without prejudice to renew following a reasonable period of discovery in order to give plaintiffs the opportunity to present all materials pertinent to the such a motion, in accordance with the requirements of Rule 12(d).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) (effective December 1, 2009) and W.D.N.Y. Local Civil Rule 72(b) (effective January 1, 2011).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Assocs., 66 F.3d 566 (2d Cir. 1995); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

_____
\s\ Hugh B. Scott
Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
August 15, 2011