UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Cheryl A. Foti, et al.,

                                        Plaintiffs,

                                                              **Hon. Hugh B. Scott**

                        v.                                    10CV575A

                                                              **Decision**
                                                              **&**
                                                              **Order**

City of Jamestown Board of
Public Utilities, et al.,

                                        Defendants.

---

Currently pending before the court is the plaintiffs' motion to compel discovery, and other relief (Docket No. 74) and defendants' cross-motion for sanctions. (Docket No. 80).

**Background**

The plaintiffs, Cheryl A. Foti, Dennis MCCullough, and Cynthia Loftus (referred to collectively as "Foti" or "the plaintiffs"), commenced this action under the Clean Water Act, 33 U.S.C. §§1311 et seq., against the City of Jamestown Board of Public Utilities ("BPU") and City of Jamestown ("Jamestown"). The plaintiffs allege that the defendants have failed to deal with sewer backups resulting in raw sewage flooding their property and homes in 2009. (Docket No. 1 at ¶¶ 12-34; Docket No. 77 at ¶¶26-27). The record reflects that some of the plaintiffs have been affected by repeated sewage backups, with as much as 39 inches of sanitary waste flooding basements, as far back as the 1990s. (Docket No. 69-1, Exhibit E). Eventually, the New York

1

State Department of Environmental Conservation ("DEC") became involved and the defendants agreed to a Consent Order in 2006 acknowledging that certain Jamestown residents had been subjected to sewer backups in their basements constituting a "public health nuisance." (Docket No. 1 at ¶¶ 27).

The parties have had multiple discovery disputes in this case.  The defendants filed a motion to compel (Docket No. 39).  That motion was determined to be moot after the plaintiff's cross-motion to extend discovery was granted (Docket No. 49). Jamestown filed a second motion to compel (Docket No. 49) and the plaintiff filed a motion for a protective order (Docket No. 51). These disputes were resolved through facilitation with the Court (Docket No. 54).  The plaintiff then filed a motion to compel (Docket No. 57), which was denied without prejudice after the parties advised the Court that they had resolved some, but not all of the discovery disputes.  The Court directed the parties to re-file a motion containing only the remaining discovery issues  (Docket No. 72).  The plaintiff then filed the instant motion asserting those discovery disputes that remain unresolved. (Docket No. 74).[1] The defendants have filed a cross-

---

[1]   At the outset, the defendants argue that the plaintiffs' motion is materially deficient under Rule 7(a)(1) in that the notice of motion makes no mention of the contemporaneously filed memorandum of law, and seeks only the sealing of the motion – and not the actual discovery to be compelled – as the relief sought by the motion. (Docket No. 82 at page 2). Inasmuch as it is apparent that the defendants were able to discern the relief the plaintiffs were seeking and have not demonstrated any prejudice resulting from the technical deficiencies, such issues are moot. Similarly, the defendants assert that the plaintiffs' motion is untimely. (Docket No. 82 at page 3). The plaintiffs assert that they were not able to file the motion by the original deadline because on the day before the motion deadline, the defendants served the plaintiffs with 1500 pages of additional documents which were purportedly intended to cure the deficiencies in the defendants' prior production. Two weeks later, upon the filing of the instant motion, the plaintiffs requested a two-week extension of time to file the motion due to the defendants' last minute production. (Docket No. 77 at ¶¶ 8-11). Again, the defendants have not demonstrated any prejudice resulting from the two week delay in the filing of the motion. Under these circumstances, the Court grants the plaintiffs' request for an extension to file the motion *nunc pro tunc* and the motion is deemed to be timely filed.

motion seeking sanctions (Docket No.  80).

## Remaining Discovery Issues

Time Limitation Relating to Scope of Discovery

The plaintiffs complain that the defendants have unilaterally imposed a time restriction to the plaintiff's discovery requests in that the defendants would produce discovery going back only as far as June of 2009.  The plaintiffs contend that the defendants should be required to produce relevant material that precedes the events of 2009. (Docket No. 77 at page 9).  The defendants contend that the "relevant time period" is "June 20, 2009 to the present" because June 20, 2009 is the date of the first overflow set forth in the complaint.  (See Docket No. 62, Exhibits A-D, ¶5 respectively).  However, the plaintiffs complaint asserts that there have been "repeated" sewer discharges on their property which have required them to expend "a great deal of time and money" to repair their property. (Docket No. 1 at ¶25).  The complaint specifically cites to two occasions, on June 20, 2009 and August 9, 2009. (Docket No. 1 at ¶¶28-34).  The plaintiffs' also point to the 2006 Consent Order in which the defendants acknowledged that certain Jamestown residents had been subjected to sewer backups in their basements constituting a "public health nuisance." (Docket No. 1 at ¶¶ 27). In this regard, the record reflects correspondence dated July 5, 1994 from one of the plaintiffs, Dennis McCullough, to the defendants discussing damage to his property resulting from sewer backups on at least five occasions between 1991 and 1994. (Docket No. 69-1, Exhibit E). According to this correspondence, on more than one prior occasion Jamestown had previously accepted responsibility for the damages caused by the sewer backups and paid for the clean-up and damages. (Docket No. 69-1, Exhibit E at page 1).  Further, issues regarding the sewer design and its history of overflows is relevant to the defendants' "upset

defense"[2] suggesting that the overflows of which the plaintiffs complain were the result of

extraordinary weather and not the result of inadequately designed or maintained facilities. The

plaintiffs have argued that the overflows are not "upset" events, but the result of specific design

defects in the sewer system. (Docket No. 18 at page 23-24).  Indeed, the record reflects that in

2007, Jamestown stated that its goal was to effectively manage the sewer system intake to avoid

the far more costly alternative of sewer replacement or enlargement. (Docket No. 12-3 at page 5;

Docket No. 18 at page 24). This reflects that the sewers in question may have been inadequate as

originally designed.  Thus, discovery prior to 2009 is relevant to the claims and defenses asserted

in this matter.  To the extent that they have not yet done so, or unless otherwise agreed to by the

parties, the defendants are directed to supplement their discovery responses in this case to

produce documents and other historical material relevant to the respective discovery requests for

the time period as requested by the plaintiffs.


   Whether the Documents Produced by E&M are Privileged

        The parties dispute whether documents produced by a third party contractor E&M

Engineering ("E&M") are privileged. The work product doctrine under Fed.R.Civ.P. 26(b)

creates a qualified immunity from discovery for: (1) documents or tangible things, (2) prepared in

anticipation of litigation or for trial, (3) by or for a party or by or for the party's representative.

See 8 C. Wright & A. Miller, Federal Practice and Procedure §2024, at 196–97 (1970).   Rule

---

        [2]    The Clean Water Act, 40 C.F.R. §122.41(n)(2), provides an exception to responsibility
for "upset" events which represent unintentional and temporary non-compliance with permit
limitations caused because of factors beyond the reasonable control of the permittee. The
defendants claim that extraordinary weather conditions resulting in an overwhelming amount of
rain in a short period of time caused the overflows on June 20, 2009 and August 9, 2009. (Docket
No. 12-15 at page 21; Docket No. 18 at page 23).

26(b) (3) provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> (i) they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

The work product privilege establishes a zone of privacy for an attorney's preparation to represent a client in anticipation of litigation. See  Hickman v. Taylor, 329 U.S. 495, 510-11 (1947); United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir.1998).  The party asserting the work-product privilege "bears the heavy burden of establishing its applicability." In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 183 (2d Cir.2007). The privilege includes both opinion work product, such as an attorney's mental impressions or legal theories, and fact work product, such as factual investigation results. See In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d at 183; see also Fed. R. Civ. Proc. 26(b)(3)(B) (codifying protection for opinion work product). In order for a party "to assert privilege under the attorney work product doctrine, they must be able to show that the document[ ][was] prepared (1) 'in anticipation of litigation' (2) by a party or its representative and (3) not in the ordinary course of business." Ricoh Co., Ltd. v. Aeroflex Inc., 219 F.R.D. 66, 68 (S.D.N.Y.2003); see also Schomburg v. New York City Police Dept., 298 F.R.D. 138 (S.D.N.Y., 2014). See also United States  v. Adlman, 134 F.3d 1194, 1202 (2d. Cir. 1998)(the work product doctrine does not require that the documents be prepared at the behest of counsel, only that they be prepared "because of" the prospect of litigation.) See also United States v. Nobles, 422 U.S. 225, 238–39 (1975)("attorneys often must rely on the

assistance of investigators and other agents in the compilation of materials in preparation for

trial," and therefore "the doctrine protect[s] material prepared by agents for the attorneys as well

as those prepared by the attorney for himself."). Once a party establishes that its document is

protected by the work-product privilege, the burden shifts to the party seeking discovery to prove

that discovery is warranted. If a document constitutes fact work product, it is not discoverable

absent a showing of "substantial need"; in contrast, opinion work product is not discoverable

absent a "highly persuasive showing" of need. In re Grand Jury Proceedings, 219 F.3d 175,

190–91 (2d. Cir.2000); see United States v. Ghavami, 882 F.Supp.2d 532, 540 (S.D.N.Y.2012)

(opinion work product "is entitled to virtually absolute protection").

Also, "[t]he privilege derived from the work product doctrine is not absolute[,] ... it may

be waived." United States v. Nobles, 422 U.S. 225, 238–39 (1975). "The party asserting the

protection afforded by the work product doctrine has the burden of showing both that the

protection exists and that it has not been waived."  Bank of Am., N.A. v. Terra Nova Ins. Co.,

212 F.R.D. 166, 169 (S.D.N.Y.2002).  Ipse dixit assertions or unsupported conclusions are

insufficient to establish the privilege. E.E.O.C. v. Johnson & Higgins, Inc., 1998 WL 778369, *4

n. 4 (S.D.N.Y.1998) (attorney's conclusory statement that documents reflected the attorney's

"thoughts, impressions and strategies" and were therefore protected was insufficient to establish

work product protection) (citing In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223,

224–25 (2d Cir.1984)). "Opinion" work product, or work product "implicating the mental

impressions, conclusions, opinions or legal theories of an attorney," enjoys "near absolute

immunity." In re Application of Minebea Co., Ltd., 143 F.R.D. 494, 499 (S.D.N.Y. 1992).

A party will waive work product protection when it uses the protected documents "in a

manner that is inconsistent with the protection." Id. at 170. Because the work product doctrine

protects documents prepared in anticipation of litigation or for trial by or for another party or its representative, the test for waiver "is whether the disclosure at issue has "substantially increased the opportunities for potential adversaries to obtain the information." In re Vitamin C Antitrust Litig., 2011 WL 197583, at *2 (E.D.N.Y. Jan. 20, 2011) (quoting In re Visa Check/Master Money Antitrust Litig., 190 F.R.D. 309, 314 (E.D.N.Y.2000). Generally, if a party discloses work product materials to an adversary, any privilege relating to those materials is waived. In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir.1993)("[I]f a party discloses work product materials to an adversary, the privilege is deemed waived."); Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 1996 WL 668862 (S.D.N.Y.,1996)( Plaintiffs' failure to take the above precautions to prevent disclosure weighs in favor of a finding of waiver of work product protection.).

It is undisputed that prior to 2009 the defendants engaged E&M to assist the defendants with complying with the 2006 Consent Order. After the commencement of the instant action, the plaintiffs served a subpoena upon E&M seeking documents relevant to E&M's work in assisting Jamestown with the Consent Order (Docket No. 62, Exhibit J). According to the plaintiffs, E&M was known to have collected information concerning the sewer system, its design, its problem areas and remedial work to correct any problems. (Docket No. 62 at ¶ 45). After serving the subpoena but before obtaining any documents based upon the subpoena, counsel for the plaintiff states that he contacted counsel for the defendants to ensure that E&M was not the defendants' expert. (Docket No. 76 at page 3). According to the plaintiffs, counsel for the defendants did not object to the subpoena served upon E&M. (Docket No. 62 at ¶ 52; Docket No. 76 at page 3). The plaintiffs eventually reviewed the subpoenaed documents at the office of E&M's attorney, Brian Sutter, Esq. (Docket No. 76 at page 3). After determining that the

7

documents were relevant, the plaintiff requested that the documents be copied. The plaintiffs

obtained copies of the documents from E&M and provided a copy of all the produced E&M

documents to the defendants. (Docket No.  76 at page 3).  The plaintiffs assert that at no time

prior to the inspection did the defendants object to the production of the E&M documents.[3]   Nor

did the defendants list any of the documents produced by E&M on their privileged list. (Docket

No.  62 at ¶¶ 56-57).[4]

The instant dispute focuses on the January 13, 2012 letter from E&M's Project Manager

Garrett M. Hacker to Michael Saar, an employee of the defendants ["the Hacker Letter"] (Docket

No.  62; Exhibit L). According to this letter, Hacker met with Saar to inspect the sanitary sewer

along Widrig Avenue to "determine if a bottleneck exists in the sewer along Widrig Avenue, and

---

[3]   Indeed, the plaintiffs' document request served upon the defendants had sought  "all documents, including reports or email, to or from E&M Engineers and Surveyors PC relating to the Sewer System" [Request No. 12] and "all documents ... to or from Randy Peterson [a Jamestown employee] or any of his subordinates relating to or referencing (a) [the 2006 Consent Order], or (b) E&M Engineers and Surveyors PC" [Request No. 13]. (Docket No.  62, Exhibit A). The defendants' response to these requests indicated that aside from general objections and subject to the defendants' unilaterally imposed time restriction, the defendants agreed to produce documents responsive to the document requests. (Docket No.  62, Exhibit A, ¶¶12 & 13).

[4]   The defendants contend they were not required to place the E&M documents created after the commencement of this litigation on their privilege log because documents created after the commencement of litigation are subject to the work product privilege.  (Docket No. 82 at page 7).  In support of this proposition, the defendants cite to United States v. Bouchard Transp., 2010 WL 1529248 (E.D.N.Y.,2010). There, the defendant argued that any documents created after the explosion underlying the charges in that case would have been created in anticipation of litigation. While the Court recognized that typically all documents created after the commencement of litigation would be created "because of" that litigation, the Court rejected the defendant's argument that a privilege log was not needed because of the time lapse between the underlying incident and the commencement of litigation. Bouchard Transp., 2010 WL 1529248 at *1-2. Here, in light of E&M's dual role and the defendants acknowledgment that E&M's post litigation work product relating to the 2006 Consent Order remains subject to discovery (Docket No. 82 at page 6), the defendants should list on their privilege log any documents created by E&M being withheld based upon an asserted privilege.

the cause of a sanitary sewer overflow event which occurred in June and August of 2009."

(Docket No. 62, Exhibit L at page 1). Hacker stated that a review of the sanitary sewer map

revealed the existence of a 23-inch high concrete "weir wall" constructed at the intersection of

Waldrig and Hallock streets. (Docket No. 62, Exhibit L at page 1). Inasmuch as the defendants

had not produced documents relating to the construction of the "weir wall," the plaintiffs contend

that the Hacker letter and other documents produced by E&M demonstrate that the defendants

have knowingly failed to produce documents responsive to the plaintiffs' discovery demands.

(Docket No. 62 at ¶¶ 58-62).[5] Hacker concluded that "the storm sewers in the area could not

handle the storm event that occurred in June and August of 2009, nor could new storm sewers

designed to current standards." (Docket No. 62, Exhibit L at page 2).[6]

Subsequent to the production of documents by E&M to the plaintiffs, and on the eve of

scheduled depositions, the defendants asserted that the Hacker Letter and certain other

---

[5]   The plaintiffs also point to other letters between E&M and the defendants as
evidencing that the defendants have not produced all relevant documents in this case. A July 15,
2009 letter from Ben Slotman of E&M to Randy Peterson, a BPU employee ["the July 15, 2009
Slotman Letter"], states that the "DEC noted Basement Backups on Widrig Ave. and has asked
that this Drainage Area study be moved up in the time line." (Docket No. 62 , Exhibit N at page
2). An earlier letter dated July 2, 2008 from Slotman to Peterson requested information from
the defendants regarding a "list of basement backups, overflows and surcharges for 2007-2008,"
"locations where backflow prevention valves were recommended," flow rates for dry and wet
weather, and a copy of "city sewer maps showing ... problem areas." (Docket No. 62, Exhibit N,
July 2, 2008 Letter). These two letters, and the Hacker Letter, pre-date the commencement of this
lawsuit. A January 13, 2010 letter from Slotman to Peterson and a February 1, 2012 letter from
Hacker to Saar, requested similar information from the defendants regarding subsequent calender
years. (Docket No. 62, Exhibit N, January 13, 2010 and February 1, 2012 Letters). The plaintiffs
assert that the defendants failed to produce copies of these letters, as well as the many of the
materials referred to in the letters, when responding to the plaintiffs' discovery requests. (Docket
No. 62 at ¶72).

[6]   The defendants assert that the Hacker Letter does not acknowledge the existence of an
sanitary sewer overflow ("SSO") and that the defendants have not disputed the existence of a
weir wall on Hallock. (Docket No. 64 at ¶ 10).

documents produced by E&M are privileged. The depositions of Hacker and others were adjourned until the issue could be resolved. (Docket No. 76 at page 4). The defendants now argue that the Hacker Letter and approximately 17 other pages of documents designated by Bates numbers 1239, 1399-1407, 1423-1425, and 1427-1432 (Docket No. 83 at ¶47)[7] are privileged in that they "relate to work performed at the direction of counsel in preparation for mediation." (Docket No. 64 at ¶7). The defendants assert that at some unstated date they "retained" E&M to provide litigation support services in connection with this lawsuit. (Docket No. 78 at ¶ 3).[8] The defendants acknowledge that not all communications between the defendants and E&M are privileged work product communication. In this regard, the defendants state that they have produced documents relating to the defendants communications with E&M even subsequent to the commencement of this litigation because they relate to E&M's work relating to the 2006 Consent Order. (Docket No. 82 at page 6). The analysis as to whether the E&M documents constitute work-product is muddled by fact that the defendants had engaged E&M prior to the

---

[7]   In response to the plaintiffs' initial motion regarding whether the E&M documents were privileged, the defendants designated only "E&M 1402-1406 and 1423-1425" as being privileged. (Docket No. 64 at ¶7). The defendants do not explain why the additional documents now claimed as privileged escaped such a designation in connection with the earlier motion. The Hacker Letter appears to be the only E&M document, alleged to be privileged, which is in the record before the Court. The Bates numbers which appear on the Slotman letters (Docket No. 62, Exhibit N) do not match the Bates numbers designated by the defendants as privileged documents. The defendants have offered to provide the remaining documents for which they claimed privilege to the Court for *in camera* review but do not suggest that the nature or character of those documents is meaningfully different than the Hacker Letter. (Docket No. 64 at ¶7; Docket NO. 83 at page 16).

[8]   Saar states that E&M "was retained by the defendants ... to provide litigation support services." (Docket No. 78 at ¶ 3). In support of this statement, Saar attaches two invoices indicating that E&M billed the defendants separately for the work performed in support of this litigation and the work performed in connection with the 2006 Consent Order. (Docket No. 78 at Exhibit A).

commencement of this action for non-litigation related services, and because the requests to E&M for information came from the defendants themselves and not directly from defense counsel.  With respect to the Hacker Letter, however, the defendants have presented emails in which William L. Wright, Jr. Esq., presumably as "in-house" counsel to the defendants, stating that the attorneys from Webster Szanyi had asked Wright to prepare: (1) an engineering/technical discussion of the plaintiff's bottleneck theory; (2) documents demonstrating that the town is in substantial compliance with the 2006 Consent Order; and (3) an explanation of specific investigation and remediation items that have been performed in the sewer collection area, including flow testing, smoke testing, camera work, and repair orders. Wright advised Saar that this material was needed to be incorporated into a brief for the mediator. (Docket No. 83, Exhibit H).  Although the email exchange in the record does not instruct Saar, who is an engineer, to engage E&M to obtain this information, it appears that Saar did so and the Hacker Letter was subsequently provided by E&M to Saar to address some of these issues.

The plaintiffs argue that the Hacker letter is not subject to the work product privilege because the subject matter of the letter involves work that E&M performed pursuant to its agreement to assist the defendants in complying with the 2006 Consent Order, or at best, was produced by E&M for **both** business reasons (work relating to the 2006 Consent Order) and in connection with this litigation. (Docket No. 76 at pages 6-7). As discussed in <u>Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.</u>, 2011 WL 2207513 at *3 (S.D.N.Y.,2011), where documents serve a dual purpose, the Second Circuit has "emphasized that the 'because of ' formulation ... withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation."  The emails between Wright and Saar reflect that the Hacker Letter addresses some of

11

the information which Wright had asked Saar to obtain based upon the request of counsel in this matter. While the Hacker Letter does not specifically refer to this litigation, it does discuss the overflow incidents in June and August of 2009 which underlie the plaintiffs' claims. (Docket No. 62, Exhibit L). Thus, it appears likely that the Hacker Letter was created because of the instant litigation. Whether E&M would have been required to provide this information to the defendants in an essentially similar form absent the instant litigation is unclear based upon this record.

In any event, even assuming that the work product privilege applies to the Hacker Letter (and the other purportedly privileged documents produced by E&M), the defendants have waived any work product privilege relating to these documents. The defendants contend that the privileged documents were inadvertently produced and that the work product privilege associated with those documents should not be considered to have been waived. Determining whether a party's inadvertent disclosure of otherwise privileged material constitutes a waiver requires balancing four factors: "(1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the overarching issue of fairness." HSH Nordbank AG New York Branch v. Swerdlow, 259 F.R.D. 64 (S.D.N.Y.,2009) quoting United States v. Rigas, 281 F.Supp.2d 733, 738 (S.D.N.Y.2003).

With respect to the first factor, the record reflects that the defendants took no steps whatsoever to prevent the disclosure of any privileged documents in the possession of E&M. The plaintiffs state that prior to serving a subpoena on E&M, plaintiffs contacted defendants' counsel to inquire whether the defendants were using as an expert or consultant in this case, and that defendants counsel advised that E&M would not be used as an expert. (Docket No. 77 at ¶

12

90). The defendants do not dispute this representation. The defendants also do not dispute that they were advised that plaintiffs' counsel had served a subpoena (Docket No. 62, Exhibit J) upon E&M to obtain all documents, including *all* communications between E&M and the "Jamestown BPU"; all documents  relating to the 2006 Consent Order; and all documents relating to the sewer system in the Widrig and Hallock area.  Indeed, the record reflects that plaintiffs' counsel copied the defendants' counsel on various emails between plaintiffs' counsel and E&M's counsel relating to scheduling a review of the E&M documents. (Docket No. 69, Exhitbit S).  Due to scheduling conflicts involving E&M's counsel, the plaintiffs were not able to review the E&M documents until three months *after* the subpoena had been served on E&M.  (Docket No. 77 at ¶¶ 93). Notwithstanding this extended time period, the defendants do not identify any actions taken by them to ensure that any privileged documents in the possession of E&M were not disclosed. The defendant do not argue that they should have been able to rely upon E&M's counsel to segregate any privileged documents from production.  In any event, such an argument would not be persuasive. Gragg v. International Management Group,  2007 WL 1074894 (N.D.N.Y.,2007) (it was not reasonable for outside counsel to rely on in-house counsel to separate privileged documents, where there was no communication between outside and in-house counsel in this regard.).  Thus, the first factor weighs heavily in favor of a finding that the defendants waived any privilege relating to the disclosed documents. See Atronic Intern., GMBH v. SAI Semispecialists of America, Inc., 232 F.R.D. 160 (E.D.N.Y.,2005)(where counsel made no attempt to separate privileged documents from production, the Court found "that plaintiff's conduct was so careless as to suggest that it was not concerned with the protection of the asserted privilege.").

It appears that E&M produced 2318 pages of documents. (Docket No. 69, Exhibit T). It is

likely that many of these documents concerned E&M's compliance work on the 2006 Consent

Order and pre-dated the commencement of this litigation.  The defendants have not demonstrated

that the volume of documents would have made it difficult to locate or identify the few

privileged documents E&M produced.  Indeed, where, as here, defendants were allegedly using

E&M for dual purposes, it was incumbent upon the defendants to make some effort to ensure that

E&M kept any allegedly privileged documents separate from the documents E&M would

produce in the ordinary course of its work relating to the 2006 Consent Order.  The record does

not reflect that any effort was made by the defendants to ensure that E&M segregated documents

which might be subject to any privilege in this case.  Given the length of time between the

service of the subpoena and the date on which plaintiffs' counsel actually reviewed the

documents, the defendants had ample opportunity to conduct their own review of the documents

or request that E&M segregate the documents the defendants now contend are privileged.

Altronic, 232 F.R.D. at 165 (Plaintiff's explanation that counsel carefully and thoroughly

reviewed the two e-mails produced but did not identify them as privileged because the attorney

conducting the review was not familiar with the attorney identified in the emails leads the Court

to conclude that regardless of the size of the document production, plaintiff would not have been

able to prevent disclosure of any such documents which may have been protected by the

attorney-client privilege ).  Again, in the instant case, the defendants took no steps to protect

against the disclosure of privileged material, thus the volume of the material to be produced does

not weigh against waiver.

      With respect to the third factor, it was not until just prior to the scheduled depositions that

the defendants advised the plaintiffs that it considered some of the documents produced by E&M

to be privileged.  This objection by the defendants was almost *five months after* the date of the

subpoena, *seven weeks after* plaintiff's counsel had reviewed the documents at E&M's counsel's office, and almost *three weeks after* the plaintiffs had provided copies of the documents to the defendants.  Even assuming that the defendants were not aware of the disclosure until after the plaintiffs had served copies of the E&M documents upon the defendants, the defendants objection was not immediate.  In Altronic, the plaintiff had received binders containing two inadvertently produced privileged documents *six days* before discovering the inadvertent disclosure, the Court found that inasmuch as the plaintiff failed to demonstrate why it took six days to attempt to rectify the error, this factor weighed only "slightly in favor of the plaintiff." Altronic, 232 F.R.D. at 165.  Similarly here, because defendants did not attempt to rectify the error until three weeks after they had been served with copies of the documents at issue, this factor only slightly mitigates against a finding of waiver.

Finally, with respect to the overarching issue of fairness, the record does not reflect that fairness requires a restoration of privilege to the Hacker Letter. The Court notes that the content of the Hacker Letter does not refer to any discussion with counsel in this case, does not reveal the thoughts or impressions of counsel, but does present factual information that relates directly to the plaintiffs' claims.  The Hacker Letter sets forth a factual review of the physical components of the sewer system in the Widrig Avenue area (500 linear feet of 8-inch sewer and 445 linear feet of 15-inch sewer with a 23-inch weir wall constructed in manhole 7M7). (Docket No. 62, Exhibit L at page 1). The Hacker Letter then explains that "if manhole 7M7 was surcharged during the storm event in 2009, then the 15-inch sanitary sewer upstream of manhole 7Q7 would have directed additional flow to the Widrig sewer. Without modeling the inlet capacity of the 15-inch sewer at manhole 7M7 and other downstream sewers it cannot be determined if the 15-inch sanitary entering manhole 7Q7 exceeds the capacity of the 8-inch sanitary existing." (Docket No.

62, Exhibit L at page 1).  The Hacker Letter concludes that the storm sewers in the area could not

handle the storm event that occurred in June and August of 2009 nor could new storm sewers

designed to current standards." (Docket No. 62 , Exhibit L at page 2).[9]  The issue of fairness does

not militate strongly in favor of either party and does not require that the privileged waived by

the disclosure of the Hacker Letter be restored.  See Gragg, 2007 WL 1074894 at *7 (Defendants

have argued that because the disputed materials involve litigation strategy, rather than relating to

the underlying transaction, it would be unfair to find waiver despite the inadvertence. While I

accept this contention as material to the question, I find that at best the issue of fairness does not

militate strongly in favor of either party, and is far overshadowed by the defendant's failure to

implement reasonable measures to avoid inadvertent disclosure.).

    In sum, in light of the failure of the defendants to take any precautions to prevent

disclosure, the defendants waived any privilege associated with the Hacker Letter (and the other

documents produced by E&M)[10] when the documents were produced to the plaintiffs. The Court

finds that the waiver is limited to only those privileged  materials already produced by E&M.

Gragg, 2007 WL 1074894 at *7; Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania

House Group, Inc., 116 F.R.D. 46, 52 (M.D.N .C.1987)(In a proper case of inadvertent

disclosure, the waiver should cover only the specific document in issue.).[11] The documents

---

    [9]  It would appear that this conclusion supports the defendants previously disclosed "upset" argument.

    [10]  As noted above, the defendants have not argued that the other documents which they claim are privileged are different in nature or character than the Hacker Letter.

    [11]  The defendants are also directed to supplement their privilege log to include any documents involving E&M which are being withheld from production based upon some asserted privilege.

produced by E&M may be used in connection with any depositions taken in this case.

Responses to Interrogatories 3,5,7,8, and 9

The plaintiffs assert that the defendants have failed to respond to Interrogatories 3, 5, 7, 8, and 9.  (Docket No.  77 at ¶¶ 69-70).  The defendants state that they have responded to Interrogatories numbered 3 and 7. (Docket No.  83 at ¶86).  With respect to the Interrogatories 5, 8 and 9, the defendants contend that they have "responded" to the Interrogatories by producing the information sought. The defendants cite to a "spreadsheet" which purportedly identifies the documents responsive to those demands. (Docket No.  83 at ¶87).  The defendants also contend that when the parties met and conferred regarding discovery issues, the defendants "agreed to authenticate certain documents" relating to historical backup claims. (Docket No.  83 at ¶64). This agreement is not in the record.

Interrogatory No. 3. The plaintiffs requested that the defendants identify all modifications, upgrades, improvements, or changes made to the Sewer System in or affecting the MH 7M7 area since 1990 (and to produce all documents relating thereto).  The defendants' response to Interrogatory No. 3 states that the defendants "have identified and will produce documents which are relevant to this demand. (Docket No.  62, Exhibit A, page 6).  The defendants are bound by this representation.

Interrogatory No. 5.  The plaintiffs request the defendants to identify all instances of manholes within the Sewer System becoming "surcharged," including each reported or known instance of such an event on Widrig Avenue or the MH 7M7 area (and to produce all documents relating thereto).  The defendants objected to this interrogatory on the grounds that it sought information outside of the defendants' unilaterally imposed time restriction. Notwithstanding, the

defendants stated that they would produce documents response to the request subject to their objection. As discussed above, the history of sewer system overflows is relevant to the plaintiffs' claims that the existing sewer system is inadequately designed. The history of overflows is also relevant to the defendants' defense that the June and August 2009 overflows were "upset" events. Unless otherwise agreed to by the parties, the defendants are directed to respond to this request for the time period from 1990 to the present.

Interrogatory No. 7.  The plaintiffs request that the defendants identify all sewer system overflows ("SSO") in the MH 7M7 area reported to or known to the defendants (and to produce all documents relating thereto). Although the defendants contend that they have responded to this Interrogatory (Docket No. 83 at §§86), the defendants response was to object to the plaintiffs' definition of "SSO" and to further object that the request sought material outside of what the defendants deemed was "the relevant time period." Thus, the defendants stated that they are "in possession of no documents related to known SSOs in the 7M7 area. There has never been a contemporaneous report of an SSO in the 7M7 area." (Docket No. 62, Exhibit A, at page 8). Although the defendants' general objections to the interrogatories also states an objection to the plaintiff's definitions of an SSO, the defendants responses do not identify the deficiency in the plaintiffs' definition of SSO. (Docket No. 62, Exhibit A, page 3). The respective motion papers filed by the parties do not discuss any dispute relating to the definition of an SSO. Thus, the Court assumes that the dispute relates to the time period relating to the request. Unless otherwise agreed to by the parties, the defendants are directed to respond to this request for the time period from 1990 to the present.

Interrogatory No. 8. The plaintiffs requested that the defendants identify all instances of sewage backing up into "houses, commercial facilities or industries" in the MH 7M7

18

area (and to produce all documents relating thereto). The defendants objected to any request

seeking information for an "SSO or Basement Backup that did not allegedly occur on June 20,

2009 and August 9, 2009." Unless otherwise agreed to by the parties, the defendants are directed

to respond to this request for the time period from 1990 to the present.

Interrogatory No. 9. The plaintiffs request that the defendants identify all persons

who have complained about SSOs, sewage backups or other discharges of sewage in or around

the MH 7M7 area (and to produce all documents relating thereto). The defendants only

objections to this interrogatory were: to the definition of SSO; that it seeks information outside of

the "relevant time period"; and that it seeks information for SSOs or Basement Backups that did

not allegedly occur on June 20, 2009 and August 9, 2009." As discussed above, the parties'

motion papers do not discuss any dispute relating to the definition of an SSO. Unless otherwise

agreed to by the parties, the defendants are directed to respond to this request for the time period

from 1990 to the present.


Files of Wright and Peterson regarding the Consent Order

The plaintiffs seek documents allegedly in the possession of William Wright, Esq.

and Randy Peterson (former Deputy General Manager of BPU). The plaintiffs allege that

Wright, as an attorney, was involved in the evaluation of flood and basement back up claims on

behalf of the Jamestown BPU for 15 to 20 years. (Docket No. 62 at ¶96). The plaintiffs assert

that Wright has interacted with at least two of the plaintiffs on prior occasions relating to sewage

flooding their homes. The plaintiffs also allege that Wright was involved in the negotiations of

the 2006 Consent Order and that as a result of meetings between Wright and the DEC, the

Consent Order was modified to remove the express references to Widrig Avenue. (Docket No.

77 at ¶ 45).   Peterson was also allegedly involved in the meetings with the DEC regarding the

Consent Order. (Docket No.  77 at ¶ 45).   The plaintiffs assert that Wrights's files are in the

possession, custody or control of the defendants.  (Docket No.  62 at ¶ 97).   In response to the

instant motion, the defendants do not appear to dispute that the Wright documents are in their

possession custody or control and have indicated that some of Wright's files have already been

made available to the plaintiffs. (Docket No.  83 at ¶ 27).   Further, the defendants do not argue

that the Wright documents are not subject to discovery, but instead assert that the material has

already been produced or is otherwise in the possession of the plaintiffs. (Docket No.  83 at ¶ ¶

76-81).   The defendants also claim that they have produced a portion of the "sewer books" and

agreed to make the remainder available to the plaintiffs at the BPU office for inspection by

plaintiffs. The defendants contend that the plaintiffs have failed to avail themselves of this

opportunity. (Docket No.  83 at ¶79).   Notwithstanding such representations by the defendants,

the plaintiffs contend that the documents have still not yet been produced. (Docket No.  79 at ¶¶

27-36).

   This litigation is four years old.  Further protracted proceedings as to whether or not the

documents have previously been produced is not in the interest of either party.  The parties are

directed to confer and review what documents have been produced to the plaintiffs.  Absent the

agreement of the parties otherwise, to the extent that the defendants are in the possession,

custody or control of the requested documents from the files of Wright or Peterson, the

defendants are directed to re-produce the documents.

Maps and Other Data

The plaintiffs argue that the defendants have failed to produce all versions of the "Casler" map, data, and other documents related to the design of the sewer system. (Docket No. 77 at ¶51). According to the plaintiffs, deposition testimony and other discovery produced by the defendants suggests the existence of additional maps and invert data not yet produced by the defendants. (Docket No. 77 at ¶ ¶52-57). For example, the plaintiffs contend that at his deposition, Saar testified that invert data was available. (Docket No. 77 at ¶56). The plaintiffs assert that after the plaintiffs requested production of this invert data, the defendants claimed that "only estimated invert data exists and that the BPU does not attest to the accuracy of the estimates. (Docket No. 77 at ¶ 57). The defendants do not address this specific argument, but assert that "all drawings of the Sewer System (including Casler maps, with all revisions) in the defendants possession or control have been produced ... ." (Docket No. 83 at ¶ 83). In reply, the plaintiffs contend that they have only been provided with one version of the Casler map which indicates that the most recent revision was made in 2000. According to the plaintiffs, there have been multiple revisions to the Casler map subsequent to the filing of this lawsuit in 2010. The plaintiffs state that the defendants have not produced these revised maps. (Docket No. 79 at ¶ ¶ 47-49).

According to the plaintiffs, Saar also testified that the defendants could generate a map with "GIS data" on it. (Docket No. 79 at ¶ ¶ 42-46). The plaintiffs have requested this information and contend that the defendants have failed to produce it. The defendants' response to the instant motion does not address this argument.

The plaintiffs also seek production of hydraulic calculations and capacity flow rates relating to the sewer system. The plaintiffs state that the defendants had advised the DEC that it

had purchased portable flow meters and wold be "logging data" to identify and remediate areas

with excessive inflows. According to the plaintiffs, manhole 7M7 was identified as a location

that experienced "excessive inflows." (Docket No. 77 at ¶ 65;  Docket No.  69, Exhibits I & J).

Further, the plaintiffs assert that the defendants entered into a contract with E&M to perform

flow metering. (Docket No.  77 at ¶66 citing to the E&M contract attached as Exhibit W to

Docket NO. 69).  Notwithstanding, the defendants assert that no such data exists. (Docket No.

83 at ¶85).

    The plaintiffs also assert that the defendants have not produced all of the documents

responsive to some of the plaintiffs' other discovery demands. For example, although the

defendants have stated that they cannot find any documents or photos relating to the weir wall at

issue, Saar testified at his deposition that he had taken a picture of it. (Docket No.  79 at ¶¶ 52-

53). While the photo was produced by E&M (Docket No.  79 at ¶ 54) it was not produced by the

plaintiffs. (Docket No.  79 at ¶¶ 52-57).

    The crux of the plaintiffs' claims in this case is that the sewer system affecting the area

around Widrig Avenue was inadequately designed. The Casler map revisions, GIS data,

hydraulic calculations and other data requested by the plaintiffs are relevant to the plaintiffs'

claims, as well as the defendants' "upset" defense in this case.  While the defendants cannot

produce discovery that does not exist, the deposition testimony and other discovery pointed to by

the plaintiffs suggests that some additional documentation exists or existed at some point in time.

For example, a letter from Peterson to the DEC in 2006 does represent that Jamestown

"embarked on a program of installing flow meters in its pump stations" and also purchased 6

portable flow meters to collect and log data in various places including the Hallock Street

drainage area. (Docket No. 69, Exhibit G, page 1). In light of such a representation made by the

22

defendants to the DEC, it is not unreasonable for the plaintiffs to believe that such data exists.

The defendants are directed to produce all Casler maps, GIS data, hydraulic calculations, flow

data, photographs and other maps and data responsive to the plaintiffs' discovery demands.  To

the extent that the defendants contend that such information does not exist, responsible

representatives of Jamestown and the Jamestown BPU shall each submit an affidavit,  under

oath, attesting that the information sought by the plaintiffs does not exist, and stating what efforts

were made to locate the documents, maps and other data requested. If such requested information

existed at one time, but no longer exists, the affidavits shall address the dates and circumstances

surrounding the destruction of the information.  Counsel for the defendants shall similarly

provide an affidavit outlining efforts made by counsel to identify and locate the information

requested by the plaintiffs.


Notice to Admit

The plaintiffs had also served Requests to Admit upon the defendants. The plaintiffs

argue that the defendants' response to Request No. 8 is "defective." (Docket No. 77 at ¶ 76).  The

plaintiffs' asked the defendants to "[a]dmit that there has been no excavation of Widrig Avenue

since in or before 1996 to perform inspection, maintenance or repair of the Sewer System."

(Docket No. 62-1 at page 7).  The defendants responded:

> Defendants incorporate by reference all objections listed in the
> Preliminary Statement and Objections. In particular, Defendants
> specifically object to Request for Admission #8 as overly broad,
> unduly burdensome and not reasonably calculated to lead to the
> discovery of admissible evidence. Subject to these objections,
> Defendants deny the Request for Admission because it does not
> specify which sewer system the Request refers to, and further deny
> the Request for Admission because it contains an inference that
> maintenance or repair of sewer systems requires excavation of

23

streets.

(Docket No. 62-1 at page 7).

The plaintiff asserts that although the defendants denied the notice to admit, they have failed to identify any modifications, upgrades, improvements, or changes made to the sewer system that involved excavation to Widrig Avenue. The plaintiffs contend that the defendants' response to the Request for Admission and discovery responses are incongruous. (Docket No. 77 at ¶¶ 76-77). In response to the instant motion, the defendants state: "Contrary to plaintiffs' speculation, defendants have shown that efforts were made – both before and after the alleged 2009 incidents – to address alleged issues concerning Widrig Avenue. This alone is sufficient to justify a denial of this request to admit." (Docket No. 83 at ¶ 89). This response does not address whether Widrig Avenue was excavated to address the sewer problems.

Rule 36(a)(4) sets forth the following criteria that an adequate response to a request for admissions must satisfy:

> If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it. A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, **the answer must specify the part admitted and qualify or deny the rest.** The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.

Fed.R.Civ.P. 36(a)(4) (emphasis added). Requests for admission are a tool used to expedite a trial by establishing certain material facts to narrow the range of issues at trial. Asea, Inc. v. Southern Pac. Transp. Co., 669 F.2d 1242, 1245 (9th Cir.1981); American Auto. Ass'n, Inc. v. AAA Legal Clinic of Jefferson Crooke, P.C., 930 F.2d 1117, 1121 (5th Cir.1991) ("Rule 36

24

allows parties to narrow the issues to be resolved at trial by identifying and eliminating those matters on which the parties agree").  Rule 36(a)(6) provides that a matter may be deemed admitted if the answer "does not comply with the requirements of this rule." It is undisputed that failure to answer or object to a proper request for admission, or an evasive denial, one that does not "specifically deny the matter," or a response that does not set forth "in detail" the reasons why the answering party cannot truthfully admit or deny the matter, may be deemed an admission.

To the extent that the defendants' response to Request for Admission No. 8 does not clearly admit or deny the lack of excavation in connection with any maintenance or repairs performed on the sewer in the Widrig Avenue area, it is evasive.  It has been held that before deeming an evasive response to be "admitted," it is appropriate to provide the responding party an opportunity to supplement its response.  Asea, 669 F.2d. at 1247.  The defendants are directed to amend the response to Request to Admit No. 8 so that it clearly admits or denies "the excavation of Widrig Avenue" since in or before 1996  to perform inspection, maintenance or repair of the Sewer System.


Scheduling

This case has languished due to numerous discovery disputes. The parties are encouraged to cooperate with the remaining discovery proceedings so that this matter can proceed to trial. In light of the age of this case, the following expedited schedule shall apply:

1.    **All discovery directed to be produced by this Order shall be completed within 60 days of the date of this Order.**

2.    This case has been referred automatically to the Alternative Dispute Resolution (ADR) program.  The parties are encouraged to continue efforts to resolve this

matter through mediation.

3.      The referral to mediation shall terminate on **May 29, 2015**.  In the event that settlement is not reached, the case will progress toward trial, as scheduled below.

4.      **The referral of this case to mediation will not delay or defer other dates contained in this Scheduling Order and has no effect on the progress of the case toward trial**.

5.      All fact discovery in this case shall conclude on **January 30, 2015**.  All motions to compel shall be due at least **30 days prior** to that discovery cutoff date.

6.      The plaintiff shall identify experts and provide written reports in compliance with Rule 26(a)(2), no later than **December 1, 2015**;  the defendant shall identify experts and provide written reports in compliance with Rule 26(a)(2), no later than **January 15, 2015**.  All expert discovery shall be completed on or before **January 30, 2015.**

7.      In the event settlement is not effectuated through mediation, dispositive motions, if any, shall be filed no later than **April 30, 2015**. **If no dispositive motions are filed, and no other motions are pending as of that date, the parties are directed to contact the Chambers of Hon. Richard J. Arcara within 10 days to request a trial date status conference**

8.      No extension of the above cutoff dates will be granted except upon written joint motion, filed prior to the cutoff date, showing good cause for the extension.

<u>Sanctions & Attorneys fees</u>

In light of the defendants' discovery deficiencies, pursuant to Rule 37, the plaintiffs seek to preclude the defendants from offering various evidence at trial in this matter.  In addition, the plaintiffs seek the award of attorneys fees. (Docket No. 77 at page 28).  Preclusion is a "harsh remedy" that "should be imposed only in rare situations." <u>Point 4 Data Corp. v. Tri-State Surgical Supply & Equipment, Ltd.</u>, 2013 WL 4409434(E.D.N.Y.,2013) citing <u>Art, Inc. v. Modiin Publ'g, Ltd.</u>, 843 F.2d 67, 71 (2d Cir.1988). While a finding of bad faith is not required to justify preclusion of evidence under Rule 37, a court may consider bad faith in its analysis. See

Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir.2006). Courts enjoy broad discretion in deciding whether and how to fashion sanctions pursuant to Rule 37. Design Strategy, 469 F.3d. at 294. In determining whether, in their discretion, to preclude evidence under Rule 37, courts examine (1) the party's explanation for the failure to comply with the discovery rules; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to address the new evidence; and (4) the possibility of a continuance (the "Patterson factors"). Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir.2006).  Upon review of the facts and history of the pretrial proceedings in this case, and the factors stated above, the drastic remedy of the preclusion of evidence based upon the defendants' discovery deficiencies is not warranted.

Pursuant to Rule 37(a)(5)(A), however, the defendants are directed to pay the reasonable expenses and attorneys fees incurred by the plaintiffs in connection with the bringing of this motion.  Counsel for the plaintiffs are directed to submit an application for fees and expenses including contemporaneous time records for all work performed in connection with this motion. The plaintiffs shall submit this application on or before August 15, 2014.  The defendants shall respond to the application on or before September 5, 2014. The matter will be deemed submitted without oral argument unless otherwise determined upon review of the papers.

Defendants Motion for Sanctions

The defendants have also moved for sanctions based upon the argument that the plaintiff's motion was untimely and deficient pursuant to Rule 7 of the Federal Rules of Civil Procedure. (Docket Nos. 80 and 82).  The Court has addressed both of these issues above.  The defendants have failed to articulate prejudice relating to any technical Rule 7 deficiency in the

27

plaintiffs' motion.  Further, the two-week delay in bringing the motion was warranted in light of

the defendants production of voluminous discovery one day prior to the original motion deadline.

Again, the defendants have not articulated any prejudice resulting from the short delay.  the

defendants' motion for sanctions is denied.


      So Ordered.


                             /s/ Hugh B. Scott
                             United States Magistrate Judge
                             Western District of New York

Buffalo, New York
August 5, 2014